The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, are we ready to begin, Mr. Wallman? Yes, Your Honor. I would be happy to hear from you. Please go ahead. Thank you. May it please the Court, this is Joshua Wallman from the United States Department of Justice. The District Court erred in this case in holding that the plaintiffs can establish a protected liberty interest under the Due Process Clause. As for enhanced screening at airports, which many travelers undergo randomly or for other And the Tenth Circuit has squarely held and rejected the same claims presented here, because the minimal and incidental burdens involved do not give rise to the level required for protected liberty interest. As for border crossings, the government has always had the right to stop and search all persons and property crossing the border, even for citizens, including on a random basis, and in most cases, without any showing of particularized suspicion. Searches, questioning, pat-downs, even hour-long delays at the border are entirely constitutional to be expected and not uncommon. And even the use of handcuffs or a drawn weapon, while less common, is well within an officer's on his or her trained assessment of the force necessary in a particular situation. For these reasons, plaintiffs cannot possibly meet the standard, the high standard, for a protected liberty interest implicating the Due Process Clause, which would be I think that their chief complaint here is that, is with the secrecy of the program because normally when government deprives you of a right, they let you know what they're doing. They let you know what right they're depriving you of and give you a chance to refute that case and say, no, the deprivation is a wrongful one. And so I think at the heart of their complaint lies the fact that there's an absence of notice, which would be antithetical to basic notions of due process. And I wondered if you could address that point with me. Sure. I think the first thing that I would say, Judge Wilkinson, is that before you even get to whether the process is constitutionally adequate under the Due Process Clause, you must first find that there is a protected liberty interest. And without that finding, there is no question about whether the process is adequate or not under the Constitution. That is a necessary prerequisite. And for that reason, we address that first. And we think for the reasons stated by the Sixth and the Tenth Circuits, there is no protected liberty interest. So that question doesn't even come into play. But then to address it further, there are a number of questions. Well, I'm just saying, let's assume, arguendo, that it does come into play, that there is something that makes us uneasy about a government burdening a citizen in some sort of way, and a citizen or the foreign national not even knowing of the burden or having a chance to say that the governmental action is unjustified. I think that's what leads to the uneasiness here. I understand. So let me just assume that you had found a protected liberty interest and then address that question. Let's assume that arguendo and just address the transparency point and the secrecy point. Would you mind? Sure. I'd be happy to do so. There are cases in the D.C. Circuit and the Seventh Circuit, such as the Global Relief Foundation and GIFRI and National Councils of Iran, these are cited in our brief, that talk about cases in which there's a designation on certain lists, yet the government keeps that evidence, does not disclose that evidence, the courts review the record on an ex parte basis in those cases, and those are found to be entirely consistent with the due process clause. I think you have a very different situation, say, from Well, we're not even reviewing this on an in-camera basis. That's right. Because you would only get to the question of the procedures if you found a liberty interest and that you have to sort of get there first. But if you Right. I understand that. And that's a good point. But I'm just saying, just assuming for the sake of argument that there might be a liberty  Is it right for government to proceed in this way? Yes, Your Honor. I think that, as I was saying, the cases hold that in national security cases are unlike, for example, a Social Security Administration case where the due process interest would be much different. The government's interest in the nondisclosure of this national security interest is important and significant. Okay, well, let me ask in that case, because the term national security is bandied about somewhat freely, and, you know, I think you know that courts can't be expected to genuflect at the mere invocation of the term. And so what makes, let's get below the general level of national security. Sure. Why, in your view, is national security vitally implicated by this program and would be vitally compromised if the program were jettisoned or otherwise impaired? Let me put some meat on the bones, if you will, for that. And this is in the fact section of our opening brief, which cites declarations in the record as well, if you want more information, but let me give you a general sketch of it. First, let's start with the status and what disclosure of status on the list would mean. The first is when you disclose that someone is on the terrorist screening database or the SelectT list, you are essentially acknowledging an ongoing counterterrorist investigation into that person, which is something that they would not ordinarily know just because they arrive at the airport or at the border and are screened. As we pointed out, most of the people who are screened are done for random reasons or reasons unrelated to the watch list. But if you were to disclose the status, you would tell them that they are on the list and that this is not done for random reasons. The resulting national security harm is this. First, as I said, you alert the person that they are the subject of a counterterrorist investigation. So, if you are part of a terrorist group, say a number of people, and they can all find out, are they being watched? Are they part of an investigation by the FBI or not? They will obviously choose the members to carry out an act who are not on the list rather than those who are. Then they can use that information to piece together by seeing who's on the list and who's not. They may be able to piece together the surveillance techniques, who's being watched and who's not, and what that tells them about the government's operations. Use that to perhaps destroy evidence if they know that they're part of a counterterrorist investigation. Yes, Judge Quattlebaum? So, just to stop you on that, and I'd love you to continue after this point, but wouldn't all those issues apply to individuals on the no-fly list as well? No. That's a great question. I'm sorry. I cut you off. Please continue. No, no. I think you're anticipating, because my question is, I understand the points you just made, and I also understand that you might say, well, a no-fly list is a greater deprivation, therefore you get more notice. But just in terms of any national security interest, how do you differentiate, doesn't the fact that you might provide some information about no-fly lists undermine your argument? And if not, will you explain why, please? Well, I think it's very different, and it's a great question. And let me just use some of the examples I just mentioned. One of the things that happens when you get enhanced security screening, say at an airport, is you don't know whether that's for a random reason, which is most of them, or because you're on the list. And therefore, you don't know whether there's a counterterrorist investigation against you. On the no-fly list, there's no mystery there, because you don't board the plane. People are not denied boarding on a random basis, like they're subjected to enhanced screening on a random basis. So the disclosure doesn't sort of tell you something that essentially isn't already obvious by the fact that you were denied boarding. In addition, and this is in our brief, one of the things that TSA may do is they may put federal air marshals on a flight that includes someone who's on the watch list. That doesn't come up with the no-fly list, because the person isn't boarded at all. So if you disclose the status of somebody, you may be disclosing the presence of federal air marshals and compromising that operation. So there are some differences between the selectee list, say, and the no-fly list, where the disclosure status compromises national security interests in very different ways. And I think that's a very important point, as well as the fact that the private interest is more substantial in that context than it is in the selectee list context. Well, as I understand it, to follow up on my colleague's questions, the 23-odd planes in this case do not allege that they are on the no-fly list. They are apparently on the enhanced security or the enhanced screening list. Is that correct? That's what they allege, Your Honor, that they are on either the terror screening database or the selectee list. That's correct, but not on the no-fly list. Can I just go back? No, that was my understanding. So we are dealing here purely with the enhanced screening list, right? That's correct. Counsel? Yes, Mr. Richardson. You began, and I want to go back to the sort of premise of where you started. When you're talking about the airports, and I agree it makes sense to separate the border from the airport. When you talk about the airports, you focus on the idea of minimal or incidental sort of burdens placed on the right to travel. I want to ask you why you chose those words as opposed to sort of unreasonable, which seems to be an alternative word that is used in some of these movement-related cases, is that you can't have sort of an unreasonable restriction on travel. You chose the higher or lower, depending on your perspective, incidental or minimal bar, but why don't you think that as long as it's a reasonable restriction on travel, it doesn't implicate a liberty? Well, I think maybe you read a little bit too much import into my word choice. I think we win under an unreasonable status as well. The reason I chose those words is that was some of the language that comes from the Sixth and the Tenth Circuit, but I think if you read those cases as well, you'll find that they treat that as more or less interchangeable with the concept of whether the burden is unreasonable or not. If it's minimal, it's per se reasonable. But I think that the reason why I think it would be reasonable to have enhanced security screening is this is something that people go through at the airport all the time, including people randomly getting chosen for the same enhanced screening that a watchlist person would go through, including randomly chosen on multiple consecutive flights. Can I ask one other question, and we might keep you a little bit longer than... I'll be here as long as you'd like me to. Because I don't want to cut Marvin off. So can you go back to my colleague Judge Wilkinson's question that sort of assumes a liberty interest and really wants to talk to you about process? Sure. And in that context, why is it sufficient to process the Fourth Amendment claim? So the claims here are all about searches or seizures, and they are reasonable or not under the Fourth Amendment, but at least some of these that were alleged under the Fourth Circuit's case law at least raised questions at the borders, for example, of whether you can put somebody in a freezer for an extended period of time and whether that's a seizure that is permissible under the Fourth Amendment. And if it's not, you can bring a Fourth Amendment claim and allow that as part of the process that is available to an individual subject to at least the extreme examples that your colleague gives. I think that's right, Judge Richardson, and we did mention in our brief that I think under Graham versus Connor that that's really the appropriate way to bring that kind of claim based on those extreme facts. And I think you can and should do it that way. And it's important to recognize not only the distinction between what happens at an airport and what happens at a border, but the fact that we have 23 plaintiffs in this case who collectively have taken dozens, if not more than 100 trips during the time period that they discuss, and they have varying different experiences from no incidents at all to an allegation of hours at the border. And can I follow up on that? And then I know that Judge Cardlebaum's got questions because I see his hand half going up. But let me so because it's on a point. So there are quite an array of different techniques that appear to have happened to these particular plaintiffs, an array of different searches or non-searches or seizures or non-seizures at airports and borders. And that suggests that there's not a uniform policy to me. But I want to just make sure that I understand this correctly. Does inclusion on the list from the government's perspective require any particular screening by TSA or CBP? There's lots of statements that they may be subject to enhanced screening. They may be subject to this. But is there any requirement that inclusion on the list leads to necessarily a certain action by either TSA or CBP? Sure. Let me start with CBP and the border first. And before I do, I'm already into my rebuttal time. So I'd just like to just ask to be able to answer your question and perhaps. Oh, I think you should answer the question. Okay. Thank you, Judge Wilkinson. Let's start with the border first. And I'm going to cite you first to page 415 of the joint appendix, which says this is the declaration from the CBP official. There is no requirement at somebody who's even on the watch list and across the border that they be handcuffed, that officers draw their weapons. This is based on the totality of circumstances at the particular time in the officer's assessment, not because of watch list status. Just like any other law enforcement encounter, the use of force depends on the officer's trained assessment at that time. There is, it's not necessarily the case, being on the watch list would be a sufficient reason to bring somebody to secondary screening at the border, but it is not something that necessarily must occur. And then let me switch to the airport screening. If you are on the selectee list, you will receive enhanced screening. That is not a discretionary call. And as it's described in- Just to make sure I'm clear, are you distinguishing between the database and the selectee list, or are you using those terms synonymously? I'm using them synonymously for now. Someone who's select, because of their watch list status, is going to get enhanced screening, is going to always get it. And that's what that means, and this is in our declaration, is about 10 to 15 minutes extra security. And it means instead of going through only one device, such as either the metal detector, the wand, or the advanced imaging technology, you're going to get multiple methods and your property is going to be searched in a more extensive way, your luggage. And as we point out, that's exactly the same thing that happens to someone who's randomly selected for enhanced screening. We'll get all of those techniques as if they were on the watch list, even though they're not on the watch list. And I hope that answers your question, Ted Richardson. But anything beyond that with TSA, or it sounds like anything at the border, is within the discretion of, based on the totality of the circumstances, of individual CPP or TSA officials. Exactly. Just like if you walk through the metal detector at an airport, as you must, if the alert goes off, it's going to take more time and the officer is going to make a discretionary call about how to handle that, how long it takes, what they're going to do. So that's exactly correct. Judge Qualifon, I believe you had a question. Yes, Judge Wilkinson. Do you mind if I follow up on a couple points? Oh, I wish you would. Okay. Mr. Waldman, you mentioned the Graham v. Connor case. And it for sure talks about when you have something, for example, that is covered by the Fourth Amendment or the express right, that you would look to that provision that provides the express right. I think Graham talks about substantive due process claims. Are you aware of any authority that would extend that to procedural due process claims? No, Your Honor. I'm not aware of anything that would do that. But I think the logic of Graham would extend as much. And the reason I think that that's true is when you have a few outlying or extreme facts, that's exactly the kind of thing that the Fourth Amendment is designed to capture, especially in the search context, because the Fourth Amendment inquiry is often so fact intensive. In the procedural due process claim, like this one, all the plaintiffs are seeking exactly the same process and invoking or asserting the same protected liberty interest. So that question should be judged by what is common to all of them, not what is uncommon. You should not take, I think, in a procedural due process claim, one set of facts for one plaintiff or even a few of them at a few border crossings and extrapolate that as if it applies to, say, example of the plaintiff who says, the only thing that ever happened to me is a 15-minute search at the border. The only thing these plaintiffs have in common is the fact that they were subject to some enhanced scrutiny as a result of the list, or so they allege in their complaint. And that is the only, I think, protected liberty interest that they can assert, that they have an interest in being free from that kind of enhanced scrutiny as a matter of due process. Anything else, I think, is handled, it's not as if the Constitution doesn't care about those facts. It does. It just cares about them under the Fourth Amendment, not as a matter of procedural due process. And I think Judge Richardson brought it up before about the Fourth Amendment claim. So I'll just add, I do believe that at least one of these plaintiffs has another case of Bivens' Fourth Amendment case pending in district court. I'm not sure if it's based on these facts or not, but that is a possibility of a claim that they could bring. So it seems that it would be, I guess one of the things that concerned me was that this was a facial and programmatic attack on a program from people with wildly disparate circumstances. And so, you know, in keeping with the more traditional judicial function, you would want to have attacks, particularly in the national security area, brought on an individualized basis. And Judge Richardson rightly mentioned that the Fourth Amendment provides a way to review many of these cases individually rather than programmatic, rather than make a sweeping programmatic pronouncement. And I think that as a general matter about the judicial function, you feel more comfortable when a lawsuit is between several parties, several affected parties. This isn't quite a class action, and it probably couldn't be because it would be difficult to certify a class. But I guess the question I'm asking is, are there other avenues for individualized litigation here? You're going to take the Administrative Procedure Act, and there you would want a final agency action. And certainly, this challenge brought here doesn't seem to me to have a—to represent or present a final agency action, as that term has been interpreted by the Supreme Court. But would there be an example of a final agency action with respect to the plaintiffs which could be litigated under the APA or on some individualized basis? Yes, Your Honor. In fact, I've seen a variety of different watchlist cases, and sometimes it's a single plaintiff or a small number, and sometimes it's a large number, as in this case. I do think—and this is part of our briefing—that when you have an encounter at the Supreme Court, and you file a claim for administrative relief under the program known as DHS TRIP, and you exhaust your administrative remedies, then I believe you have a final agency action that can be reviewable either under the APA or outside of it. So, to date, I have not seen anyone, any litigant, bring just a regular old APA claim. They tend, for whatever reason, to assert constitutional claims. And, of course, the plaintiffs are the masters of their own complaint. They can bring any kind of claim they want. But I think that avenue would exist to individually adjudicate these claims. I'm skeptical. I wonder how the avenue would exist, because you wouldn't have an agency action that notified you of your status. So what agency action would there be to appeal? Well, what happens is you do get a letter at the end that does, in fact, purport to be a final agency action. And on that basis, the plaintiffs brought this suit. I think that you're right, Judge Wilkinson, that there's all kinds of complicated questions about who has subject matter jurisdiction and what the record would look like in that of that nature. But the Seventh and D.C. Circuit cases that I mentioned earlier that didn't deal with this watch list but dealt with other national security matters had a record that was viewed ex parte by the court. The Ninth Circuit in Casham, which dealt with the no-fly list, said that you would have procedures in which there would be a final agency action if you're going through DHS TRIP. And whatever field record the court had to look at, it could look at that in terms of a substantive review of the watch list status. But you're telling us that that's for another day. Yes. If you brought that claim, you could bring it. But here, they've just brought a procedural due process claim, and I think they have no protected liberty interest to bring that claim. But they've also asserted claims, for example, under the Equal Protection Clause, substantive due process. They brought them collectively for 23 plaintiffs, but they have asserted other types of claims. The district court dismissed those. And because of the sort of unusual interlocutory posture of this case, they're not before the court, but they were brought by these plaintiffs. But they can choose to formulate their complaint, both their allegations and how they formulate their claims any way that they like. All right. Judge Richardson, do you have any further questions? I do not. Judge Quattlebaum, do you have any further questions? I have one more, and I appreciate your indulgence. Thank you. Counsel, the context we're operating in now is international terrorism. But I think to really think about these things, the government, the word terrorism is, you know, seems to be used more broadly and frequently now, you know, in the public domain. If this were changed to domestic terrorism, and someone was put on a watch list for being suspected of that, you know, based on, you know, political associations or some things that might not, you know, might be insufficient by some objective standard. What's the, does the process protect against that? Or is it your position that because there's not as much a deprivation of an interest, it doesn't really matter? So I hope that, does that question make sense? I think it does, Your Honor. There are declarations in the record in this case, and the agencies have stated that they do not make watch lists that is based on, for example, religious affiliation alone, political protected speech alone. Those could be factors that get considered in a particular case, but they are not themselves sufficient. And of course, plaintiffs don't necessarily have to take our word for it. If they brought an appropriate case where they had a claim, and they said I was put on the watch list for improper reasons, I do believe that if they brought a proper individualized claim, that that would be subject to judicial review. I don't think that that's an unreviewable agency action, and we're not making that case. So I understand the concern. Can you, I'm sorry, can you explain that? So how would they, how could they make that claim? They don't know whether they're on the list, much less why they're on the list. So how could, just help me understand how they could make that claim, given the sort of black box that they're faced with? I mean, I get your main point, which is there's no liberty interest, so it might be bad, it might be good, but there's just, there's not this claim, and we can worry about another claim later. But you seem to suggest that they could make, affirmatively make, a claim that they were placed on for, say, equal protection violations, solely on account of their religion. But I guess I don't understand how they could make that claim, given the black box that they're faced with. As I said before, if you brought an appropriate claim that you could assert in court, that wasn't, say, a procedural due process claim, let's imagine, for example, Judge Wilkinson's hypothetical of a straight APA claim that was not based on constitutional basis, but say, contrary to law, substantial evidence. So you didn't have to assert a liberty interest. I think there are complicated questions about how the court would adjudicate it. It's possible that it would be an ex parte record that judges would review in camera to assure themselves that the basis of the listing status was not improperly made. That was something that the court, the Ninth Circuit, suggested in Casham for review of the no-fly list. So to be candid, I don't think it's my job to sort of map out all the ways in the litigating strategy for the plaintiffs in these types of cases. But I do think those avenues for judicial review would be available. You would have complicated questions about how the record would get before the court and in what form. But I think- But it makes a difference, does it not, that this claim was brought constitutionally under the due process clause and under procedural due process, as opposed to a non-constitutional claim under the APA, which might allege that the individual deprivation was arbitrary and capricious or contrary to law or whatever. I mean, people- The question I have is sometimes people go, oh, the Constitution, the Constitution. But sometimes other routes, such as the APA, and even within the Constitution, other routes, such as the Fourth Amendment, can provide some kind of relief on an individualized basis without trying to strike down and reform the entire program. And I think that's what you're suggesting, is that the form in which this claim was brought makes a lot of difference, does it not? That's precisely right. It's your choice as a plaintiff to frame your claim as you'd like and bring the constitutional claim that governs your case then. So you don't have to bring constitutional claims. Everybody seems to want to do that. And they have a lot of obstacles as a result. But that is the plaintiff's choice. So I agree, it matters. It matters tremendously what kind of claim that you bring. Because when you bring a procedural due process claim, you have to show a protected liberty interest, which is not something you need to show under an APA claim. Judge Quattlebaum, do you have any further questions? No more questions, thank you. Judge Richardson, do you have any further questions you'd like to ask? No, thank you. We'll save them for rebuttal. All right, let's hear from Mr. Abbott then. Thank you, Judge Wilkinson. May it please the court. I'd like to start where Judge Wilkinson left off. In this case, what makes, I think, this matter simple for this court is that so long as a deprivation takes place, there is no notice. The inclusion standard for the selectee list is secret. We don't know what it is. The government hasn't disclosed it. And there's never been any case in this circuit that has ever found that no process or a process internal to the government was sufficient to counterbalance the deprivation of a liberty interest. But see, one of the things that concerns me about that argument is that you are jumping immediately to Matthews v. Eldridge, which in the terms of the balancing of interest, you know, sometimes it's a good thing to do, but at other times it can become very subjective and very mushy. And the fundamental question before you get to secrecy or openness is whether there is this deprivation of a liberty interest. And I wonder here if we were to hold that there is a deprivation of a liberty interest, whether we would not be in direct conflict with the Sixth and Tenth Circuits we would be opening up, I fear, a rather stark circuit split. And sometimes that might be justifiable. But when you're dealing with a nationwide program and there are airports all throughout the country and there are borders in many, many different states, there would seem to be an interest in uniform application of a national program dealing with obvious national security interests. So you can try to distinguish those cases, but having read them, it's hard to do on the crucial point of whether there's a liberty interest. And why would we just jump ahead and open this fissure and put ourselves at loggerheads with two other circuits in the context of a program where uniform application would seem to be really important. It would seem to be hard, for example, to have one set of procedures operating in North and South Carolina and a separate set of procedures permissible in Ohio and Michigan. And it would make those whose job it is to follow the law more difficult to understand what the law is with different circuits going different ways. So why would we want to open up this sort of conflict? Yes, Your Honor. Well, I do think that with regards to Abdi, the Tenth Circuit case, and Joshua and I were in Salt Lake City a couple of years ago on that matter. The Tenth Circuit looked at Elhadi's facts. The motion to dismiss this decision by Joe Tringa had been issued at that point. And so the Elhadi motion to dismiss decision figured prominently at oral argument as well as in the briefs. And the Tenth Circuit explicitly, when they reviewed the facts of Elhadi, said this is different. The facts in Elhadi are much different than the facts in the case before us, Abdi. And so I do think that when the Tenth Circuit was looking at Abdi, the only thing it was assessing with regards to the right of travel was the delay. That was the only thing that they believed was present in Abdi's case. But they did address this question of the underlying liberty interest, did they not? Well, they did not believe, the Tenth Circuit held that there was not a liberty interest deprived because the delays that the plaintiffs in Abdi experienced were delays regarding the processing of him entering. So their bottom line was there was no deprivation of a liberty interest found in that case, which is, you would admit, pretty analogous to our own. No, Your Honor. In this case, Abdi and Beijing were about delays at the airport. This case is about the travel and non-travel consequences associated with TSVB status. Kadura, Rujik, Halaby, JD3, Shibley, all these plaintiffs that crossed the border were handcuffed, often at gunpoint, in front of their families, in front of their children. Abdi and Beijing didn't deal with those facts. Can I ask you to follow up on that just a second? Maybe just let me break it down into a couple of pieces. Do you agree that merely incidental burdens placed on travel don't constitute a deprived liberty interest? So when I go through, I mean, I have to go through security and take my shoes off, that incidental is not sufficient? When the burdens are borne equally by all travelers, those are burdens that don't trigger a kind of... So you think it's not, so an incidental burden, it still must, so there's an equal protection aspect of the liberty interest to you, that you think is inherent in the claim? Well, that's the government's position. The government argues for that Minnesota Senior Federation case, that... I'm asking your position, though. That's what I'm trying to understand. I want to understand the line. If there's merely incidental burden placed on anybody, you think that is a deprivation of liberty interest unless it is uniformly applied to every single traveler? No, Your Honor. Incidental burdens, de minimis burdens, are not the kinds of burdens that trigger constitutional concerns. That's what I thought. I didn't think this was hard, right? It was a set up to the question, not the actual question. So then the line that I gather you're drawing is that you can't unreasonably restrict travel. And there are a couple of cases that use that line. The Supreme Court says that. Is that the line? Is the move from incidental, not enough, but sort of unreasonable restrictions, and that then sort of take the next step, I think, in saying that actually deter travel, that that's what constitutes the liberty... I'm just trying to understand the framing, right? I'm not... This isn't a trick, right? But that's the framing that we're sort of trying to look at. Yes, Your Honor. We agree with Judge Tranga that the standard that this court should apply is whether the government's actions by placing plaintiffs on the watch list, assigning them a status, have actually deterred their travel. And here, everybody... And I think this court... Before we get to this, you can follow up, but I'm trying to get to the actual question, right? So assume that you've done that, right? Assume for a minute that you've alleged restrictions on travel, maybe not ones that actually deter, but you've at least alleged restrictions on travel that are more than incidental. What I'm trying to sort of understand here is why wouldn't we look to what's reasonable under the Fourth Amendment for determining what objectively would deter travel? So we have... And this is sort of a little bit of the Graham-Albright point, but we have a very specific indication of what is reasonable as far as searches and seizures go, right? That's the Fourth Amendment. It's a whole body of case law. If we're at the border, at least in the Fourth Circuit, we look at Ishaq Khan and Colson. If we're at airport, I mean, we understand what that means. And so if the standard we're looking at is the unreasonable restriction that actually deters, and by actually deters, I assume we have some objective component. It's not merely subjective. So that it's really an objectively reasonable deterrent, at least under your theory. Why wouldn't we look to the reasonableness inquiry of the Fourth Amendment to identify what that is, instead of some free-floating idea that, oh, this person subjectively claims to be deterred? Help me understand why I don't make the move when I start talking about reasonable or unreasonable restrictions to the Fourth Amendment, and instead take it to some unmoored idea of when somebody would or wouldn't be willing to travel in light of an hour-long delay? Two-hour-long delay? Five-hour-long delay? I don't know. Yeah. You know, in Grant v. Connor, they were trying to make an excessive force claim through the Fourth Amendment and through substance of due process. And so the court, I think, in a very reasonable fashion said, you know, we shouldn't, when there's a specific constitutional grant, we shouldn't look at the more general. We should look at the more specific. But here, I think the situation is more analogous to how the Second Circuit dealt with border issues in Taba v. Shurtop, where the Second Circuit said that there was no interference with the Fourth Amendment right. But when we get to the right of association, the arrest, I'm sorry, the handcuffing, the fingerprinting, the photographing that are permissible under the Fourth Amendment still infringe on a right that is bound up with the right of association. So that's totally fair. One of the questions I have is, when we do, when we were thinking about reasonableness and whether they're under the Fourth Amendment or liberty interest, but you picked the context, which is airport searches and border searches. And that is a context, those two locales, airports and borders are where it would seem to me that the government's interest in searches and screenings would be at their zenith, because airports themselves are kind of border. But the whole location of your right to travel claims are at airports and borders. And it's at those very points that the screening interest of the government would be again at their zenith. And it doesn't, it's not hard to know why. One only need to reflect upon 9-11 and upon the dangerous materials that could be smuggled in from outside the country to know why at these particular two locales the screening interests are not unreasonable. The reasonableness would seem to me to go to a Fourth Amendment claim and also to a question of whether there was an actual violation or infringement of a liberty interest. But you picked two very problematic locations for your claim, haven't you? Well, if you take out the airport and the border, the Sigma Plus claims for these plaintiffs can exist without reference to the border, without reference to airport. And that's part of the issue with this Washington system is that it's not only that the government uses the watch list system to screen people at airports and borders. It disseminates the watch list to every single law enforcement agency in the country, all 18 some thousand. It disseminates the watch list to more than 500 private entities, more than 60 foreign governments. And this has real world effects. Anas Al-Hadi, who studied criminal justice, would love to be a police officer, is essentially precluded from entering that field because of his watch list status. Well, it's a fairly limited dissemination in one sense. I mean, they're disseminating the list of nuclear power plant operators. It seems that some of the places they're disseminating it to, there's a heightened sensitivity with respect to those. But I have another question, and I think it goes to my uneasiness with the particular way in which this has been, the claim has been framed. Rather than have a particularized claim, you seem to launch this facial attack and have this roundhouse swing. And yet the 23 plaintiffs or 22 plaintiffs here have, you know, wildly disparate circumstances. And some of them don't seem to have been detained at all. I mean, in this example on page 282 of the joint appendix, where John Doe, too, never encountered enhanced screening on more than 20 domestic flights between 2000 and 2018. And Mr. Al-Hadi traveled on seven international flights between 2012 and 2018 without incidence at departure and on three round-trip flights without incidence. And then other people were subjected to enhanced screening on only one of 10 or one of five flights and those for several hours and everything. But these are wildly disparate circumstances. And I'm just wondering, at least the class action has a certain commonality of facts and law. And this is not a class action. And I would doubt that a class could be certified here because the class members wouldn't be very similar in many respects to that of the named plaintiffs. And it just goes to the fact that we're being asked to take a highly sensitive and, as far as I know, important program and make a facial ruling with respect to it and devise a remedy with unknown consequences in terms of the resources and efforts it would require on the part of the agencies involved, we would be wading into very deep, treacherous and uncharted waters here. And I just don't understand why this can't be approached more particularly and more narrowly rather than asking us to reformulate and revise the whole program. That just seems way beyond what I'm competent to do. Well, here, the reason that a case-by-case adjudication of watchful status is impossible is because, as the government took the position prior to pre-2015, they don't acknowledge that you've been listed at all. They don't disclose the standard that people are subject to regarding the selectee list. So, if the deprivation itself is not acknowledged, if the government action is not acknowledged, as well as the inclusion standard is not disclosed publicly, there's nothing for the court to adjudicate in a case-by-case way. And I think this court, which is... When you talk about adjudication by case-by-case basis, you know, there was something to the old and the case-by-case adjudication process produced general rules. But it produced them in the course of examining particularized circumstances. And what troubles me here is we're asked to bypass this whole common law method, which still has some validity, in my judgment, even in this modern era, and to make a sweeping pronouncement without the factual context that individual cases under the Fourth Amendment or under the Administrative Procedure Act would provide. They would give us some sort of foundation, and they would, in turn, provide some kind of guidance to the relevant agencies involved. But it's a question of how we go about it. And we're asked to, you know, to bite off a huge chunk of something in an area which implicates separation of powers concerns quite profoundly. If there's an area where we should proceed cautiously, it would seem to be this, wouldn't it, Mr. Abbas? Well, I think this court should, you know, be emboldened by what happens to the no-fly list when a district judge in Oregon ordered the government to provide notice and an opportunity to be heard for people on a no-fly list. The government didn't even appeal that decision. They accepted that notice and the opportunity to be heard would be as something that they're capable of providing, and they provided it. And that's what ended up in the nine-circuit incursion, allowing that court to make a particularized assessment of the watch list, the no-fly list status of some individuals. But I think here, the issues are important. There's no question that, and we, you know, I don't envy your position, but... Can I take it back for just a second with Judge Wilkins' permission, given that we're over time, to the conversation we were having a minute ago, and we raised this concern about why don't we look to the Fourth Amendment, and you sort of responded with the Second Circuit case and said, well, the Second Circuit, they said, even though there's no specific Fourth Amendment violation, there is a specific First Amendment violation, which I don't think's responsive, but I want to give you a chance to respond to it, because we learned from Albright and Graham that that might be true for specific enumerated rights, but it doesn't apply to the due process clause, right? I mean, I take Graham and Albright to teach us, in essence, that where there's a specific constitutional provision that the injury stems from, that you must go to that constitutional provision and not the free-floating due process clause. And so, but I want to give you a chance to help me understand why that's wrong. The rights are just different, Your Honor, and I think another important thing is that, with regards to the stigma plus claim, the one of the... Stay with the travel claim, because... Sure, yes, Your Honor. The answer's only helpful to me on the travel claim. Yes, Your Honor. The right of travel... I'm just reading Graham and Albright. What I'm trying to understand is, why shouldn't I read them that way? I don't think they should be read that way, because the right of travel, while it is not specifically enumerated, is longstanding, really particularly articulated by the Supreme Court as a fundamental right, as a right that exists in various parts of the Constitution, be it the Interstate Commerce Clause, the right of association, the Fourth Amendment, there's... And there are different components of that right of travel, related to interstate travel and international travel. But here, there's overlapping protections at the border, and certainly the Fourth Amendment protects people against non-routine searches, it protects people against electronic devices, being searched at the Fourth Circuit, found in cold shoes. And the fact remains that if you are... The simple fact remains that if you are handcuffed, and your children see that, and guns are pointed at you, you're not likely to exercise that right to cross... The right that you have as an American to cross the border. And these, and these... But counsel, let me interrupt there, because you go, in answering that question, you go to an example that I know has support in the record, and my question here isn't intended to minimize that, or suggest it's not very serious, I'm not doing that at all. But it seems to me related to what Judge Richardson's just talking about, is what I would call the corollary to that. Because when I read the law, as Matthews talked about, what it says is that we look at... We look at procedural due process in generalities. In other words, in categorical type fashion. And you are, it seems to us, pulling us down to not generalities, but to individual situations that may in fact be bad. But it seems to me we're supposed to look at this... If you do look at a procedural due process claim, it's an analysis different than the one you're talking about. And I think as Judge Wilkinson mentioned, even within your plaintiffs, there's not consistency. So how do we, from what you've pled, how are we able to even undertake what Matthews tells us to, which is to look at this across the board, and find that there's anything other than some specific examples that may be extreme and bad, and may have consequences based on those individual circumstances under the Fourth Amendment or otherwise, but aren't the sort of categorical problem that the procedural due process seems to require under Matthews? Yes, Your Honor. With regards to the border, the facts are not outliers in the sense that Kedoura, Freudigick, Holoby, JD3, and Shibley, all people that were watch-listed, and I believe the only folks that were crossing land borders, experienced essentially the same thing, handcuffing, often at gunpoint, and detentions that followed. And so if you're on the watch list and you cross the border, that's likely to happen to you. And there is, Joshua brought up and said, well, not everybody that's in the PSDB gets handcuffed at gunpoint. Well, everybody that is on the selectee list appears to be handcuffed at gunpoint or handcuffed when they cross the border. But one of the challenges of this claim, and I think the way that Judge Trenga approached this issue, is that when you disseminate a person's watch-list status, you tell every agency in the federal government, 18,000 law enforcement agencies, 500 private entities, more than 60 foreign governments, if you tell all those people, these folks on the watch-list are known or suspected terrorists. And remember, they're not telling them anything else. That's the only thing that's being shared with them. Nothing about the underlying basis of that information, nothing that supports the designation, just the status. These people are known or suspected terrorists. Screeners will have the, what Judge Trenga, I'm paraphrasing, says is they'll have an understandable reaction. They're going to treat those folks a lot more harshly than they would treat everybody else. And the facts bear that out consistently. And the variations, a lot of the variations in the watch-list implementation are not, maybe are in part a result of the secret annotations that accompany a person's watch-list status. So don't think, I know it's called the no-fly list and the selectee list, but really there's only one single list. There's a single list, a watch-list, and that watch-list is annotated in various ways. And we know about some of those annotations. We don't know about all of those annotations. And here, one of the variations is that people's watch-list status has been annotated in various ways. Some of the post-litigation variations in watch-list treatment are part of the federal government's long-standing practice of altering people's watch-list status, or excluding the implementation of watch-list status. Yeah. Can I just ask, we're running a little bit out of time, but I just want to ask a couple of basically sort of record-type questions to make sure that I understand. I asked your colleague about whether inclusion in the database necessarily requires certain screening actions to take place. And he said, not for CBP. It's permitted, but not required for CBP. And then with TSA, he said, what is required by TSA is the enhanced screening, the 10 to 15 minutes. And anything beyond that was within the discretion of TSA agents. Is that consistent with your understanding? No, your honor. What am I looking at to understand why that's wrong? Yeah. So there is a good GAO chart on GA66, the Joint Appendix 664, that shows, you know, this is like just kind of a flow chart what happens to people on the watch list and what happens to people that aren't on the watch list. And what I'm asking is not whether that's what typically happens. I'm asking what's required versus what is within the discretion of individual agents. I'm asking a sort of specific question. Sure. With regards to the border searches, all of our, KEDURA for UGIS, Hullabee, JV3, and Shibley, and all their depositions show that they handed over their passport. The passport was swiped. They either see a red screen or hear an alarm and people rush to the court. Reflecting what the government CBP designee and his declaration, the deposition how, what he says is that, yes, CBP agents receive alerts that provide them instructions about how to handle those things. I think I understand that. Let me turn to a different question. And I get you. The answers disagree and you gave me some records. I'll look at it. The second question is just to be clear. You have asked only for post deprivation process. Your complaint, at least the claim that's before us, does not include a claim for pre deprivation process. In other words, before they travel, notice that they are on the list. Well, before this court now is only the question of liability. Judge Schringer separated the question of liability and remedy. And so what he, I think what his decision contemplates is certainly some kind of post deprivation, some kind of additional post deprivation process that at a minimum would reflect the no fly list post deprivation process that is aimed at a more dangerous. Have you also sought in the district court pre deprivation process? So in other words, notice before travel, before claim of everyone on that list. Our remedy briefing certainly reflects some of that, but that was stayed below. What I'm trying to make sure is just you've asked for pre and post deprivation notice. Yes, yes, your honor. And there is something that sits in the middle. The inclusion standard regarding the terrorism screening database, as well as the inclusion standards reflect to less. That's not really a pre or post deprivation. We think that the government shouldn't have secret laws that administers in secret to Americans. And so a disclosure of the selectee list standard seems self-evident and required by the constitution. But the terrorism screening database inclusion standard itself, which Judge Schrenger held to be arbitrary, unmoored from any kind of objective measure, we think also creates a constitutional issue. And it's the type of thing that courts always weigh into. What is the appropriate standard that could be used? And right now, what the inclusion standard for the TSDB allows the government to do is it allows the government to target an unpopular minority. That unpopular minority, as I think we've seen in the last few months, is shifting now to supporters of the former president and calls about listing, as Judge Clittlebaum mentioned, domestic terrorists or people that are believed to be associating with militias and things like that. The unmoored TSDB inclusion standard allows the government to include anybody they want on the list because it's not objective, because it doesn't require any kind of showing of any kind of criminal conduct. And so while it cloaks itself in the veneer of, you know, this is Terry Stott-style reasonable suspicion, in Terry, the reasonable suspicion is of criminal activity. Here, the reasonable suspicion is of anything that the government believes is, quote, related to terrorism, unquote. And as we've seen in the Muslim community, at the end of the day, you still have to come back with a procedural due process claim. I mean, the business of minorities and the rest, and whether there is a unfair and unconstitutional deprivation of the rights of minorities would seem more in the equal protection claim. If that, I don't know because about that equal protection claim, it was dismissed and the government would appear to have a compelling state interest in the program, or at least it would assert one. So I don't know how an equal protection claim would spin out, but the procedural due process claim, again, all roads lead to the question of whether there is a deprivation of a liberty interest. And the liberty interest, as the Supreme Court has said many, many times, has to be rooted in the history and traditions of the American people. And whether you take an originalist view or not, I think you ask the same question, and that is whether inconveniences and delays and the like, which are undergone by many Americans, huge numbers of Americans at airports and on the border  from Richmond to Washington the question is whether inconveniences that Americans encounter in their everyday lives, which is the inconvenience, it seems to me, the order of inconvenience we're talking about here, the question is whether that sort of inconvenience finds sufficient roots in the history and traditions of our people to qualify as a deprivation of liberty. And I think that's the singular focus of this, and I wouldn't make light for a minute if there were a problem with racial or ethnic or religious minorities, and none of us want anything like that. But that's not what's before us. What's before us is whether there's a deprivation of a liberty interest. We can try to wander away from that, but that's what it comes back to, isn't it? I think you're absolutely right, Your Honor. But just to emphasize, this is not just an inconvenience, and this is not like the experiences of these plaintiffs, even the lesser kinds of experiences of these plaintiffs are not comparable to what other people go through. Michael Coleman, a religious scholar, a religious leader, was not just search extra at the checkpoint, although he was, he was not just search extra at the gate, though he was. His travel party was approached, and the agents were looking for Michael Coleman. When his plane landed over the loudspeaker, they announced where Michael Coleman come to the front, and at the front of the plane, there's law enforcement agents waiting for him. These kinds of experiences are not inconveniences. They're not like what other people experience. And everybody, I think this is important that the Fourth Circuit deals with the facts as they exist in the record and as they exist in real life. Everybody on the watch list knows that they're on the watch list, 100%, because of the way that they're treated, because they're often told by the screeners that they're on the watch list, by befuddled and confused screeners that are getting alarming alerts, being told and instructed how to treat these folks. These people, these individuals, they're assigned handling codes for law enforcement to use when they approach them at the traffic stop. The Baltimore Police Department has handling codes, and one of the instructions says, you got to treat these people as dangerous, approach all these people as cautious, you know, as cautiously as you can. Mr. Abbas, thank you. I hope we've let you run over your time, because we let the government run over its time. I don't want to cut you short in any way, shape, or form, but I'd like to ask at this point whether Judge Richardson has further questions of you. No, thank you. Judge Quattlebaum, do you have a further question? No, sir, I'm fine. All right. Well, we want to thank you, Mr. Abbas. We appreciate your argument. And Mr. Wallen, you have some time for rebuttal. Thank you, Judge Wilkinson. I'll try to make it short and just concentrate on one point. One thing I agree with Mr. Abbas is that the factual record is very important, and I think it's important to understand as well, this case was decided on summary judgment for the plaintiffs, which means at a minimum, all facts must be construed in light of the government's favor, because we're the ones who appealed a loss of summary judgment to the plaintiffs. The claim was made essentially that every time these plaintiffs cross the border, they experience the same dramatic encounters with the law enforcement officers. And as has been repeated, I think throughout this argument, that's just not factually correct. Just to take a few of the examples that my opposing counsel mentioned, the lead plaintiff, Mr. Al-Hadi, and this, by the way, is recounted in our reply brief at page 10 and 11 with the JA sites. Mr. Al-Hadi had seven international and three domestic flights without incident, both before and after his handcuff encounter in 2015. He had no problems with a domestic flight in 2018 on the way to his deposition. He had a border crossing in 2017 that involved just 30 minutes of questioning. The same is true for the plaintiff, Kudura, who had one handcuff incident, but also many domestic flights without incident. And the same is true of Plaintiff Coleman that Mr. Abbas mentioned as well. And so, again, I think it just comes back to the commonality, which is the extreme facts, I think, are handled through the Fourth Amendment, as Judge Richardson has repeatedly noted. And as far as the protected liberty interest, the only claim that is in common for all of these people, for all the plaintiffs who invoked the same protected liberty interest is an interest in being free from any screening whatsoever, enhanced at the airport or secondary at the border, and that this is so deeply rooted in our nation's tradition in history that neither justice nor liberty would exist without. Yes, Judge Qualamon. So, and I understand that point. And I would like you, we talked about a little bit when you first argued, you know, to deal with the concern that terrorism, like I say, is being bandied about now in a way that's probably not helpful, but is broader. And Mr. Abbas talked about, you know, folks who might be, you know, linked to militia or, you know, those types of activities. And you might, we had gone a few months earlier, it might be linked to protesters, you know, about things that don't, you know, that are in the public domain. And if the government were to deem those individuals, you know, suspected of terrorism, are we left, and they have the same sort of restrictions here, you know, you're on the watch list, you may get enhanced training, some may go to extreme levels, some may not. Are we just supposed to chalk that up to, that's one of the bad things that may have happened, but it's not a constitutional wrong? Is that where we're left with on that? If this, you know, this broad topic is used in an unfair way? That's a good question. I'll go back to what Judge Wilkinson said, which is the claim we have here is one of procedural due process, and I think it fails for the reasons mentioned. You can bring other claims if you have an equal protection claim, that's a different kind of case, and it has different kinds of considerations. If you want to bring the straight up APA claim that we discussed earlier in the argument, you can bring that as well. So I'm not saying that either the constitution or the law generally doesn't care about these things. And the Fourth Amendment is another example of the kind of claim that you can bring. But when you bring a procedural due process claim, you must show it first and foremost a deprivation of a protected liberty interest, and they just haven't done that here. That doesn't necessarily tell you one way or the other how the courts would treat other types of claims. And I certainly don't think that you need to answer those questions definitively, but I do think that certain types of claims would certainly be open for the court to adjudicate, but not this one, because of a failure to state a claim. Thank you. Thank you, Judge Karlbaum. I don't have any further points to make, so I'd be happy to answer any other questions that the court may have. Judge Karlbaum, did you have further questions? I did not. I'm good. All right, Judge Richardson. Thank you very much. All right. Thank you, Mr. Wallman. We appreciate it. And I would like to thank both you, Mr. Wallman, and you, Mr. Abbas, for your arguments, and we really do appreciate them. And it's very unfortunate that we have to do all of this remotely and that we can't observe our Fourth Circuit tradition of coming by and shaking both of your hands. And thank you for the contribution you've made, but I want you to know that our appreciation is no less real. So thank you so much for appearing before us today. I'll ask the courtroom deputy if she will please adjourn court. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Julius N. Richardson, A. Marvin Quattlebaum Jr.